Filed 11/5/14  P. v. Carpenter CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEBRAY CARPENTER,<br><br>        Defendant and Appellant. | A135814<br><br>(San Francisco County<br>Super. Ct. No. 216806) |

Debray Carpenter appeals from misdemeanor convictions of resisting or obstructing an officer and assaulting an officer.  He contends there was insufficient evidence to support the former offense; the trial court inadequately instructed the jury on how to determine whether the officers were lawfully performing their duties and on appellant's obligations to comply with what "may have been" an unlawful order; and the trial court responded inadequately to a question from the jury.  We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on November 15, 2011, with felony resisting a peace officer resulting in serious bodily injury (Pen. Code, § 148.10, subd. (a));[1] felony attempting to prevent an executive officer from performing his duties by means of threats or violence (§ 69); and misdemeanor assaulting an officer (§ 241, subd. (c)).

---

[1] Further statutory references will be to the Penal Code unless otherwise specified.

Jury trial began on February 7, 2012.  On the third day of deliberations, the jury informed the court that it had found appellant not guilty of the felony charged in count 1 but guilty of the lesser included misdemeanor resisting or obstructing an officer (§ 148, subd. (a)(1)), and guilty of the misdemeanor charged in count 3.  The jury indicated it was deadlocked on count 2, then after listening to portions of the transcript it requested, hearing the court's responses to questions it posed, and further deliberating, found appellant guilty of the lesser included misdemeanor resisting or obstructing an officer (§ 148, subd. (a)(1)) on this count.

On April 27, 2012, the court sentenced appellant to six months in county jail on each of the three misdemeanor counts, with the sentences on counts 1 and 3 to be served concurrently and the sentence on count 2 consecutively; suspended execution of this sentence; and placed appellant on three years' probation.  The conditions of probation included 60 days in county jail, with credit for 11 days of time served, to be served through the Sheriff's Work Alternative Program (SWAP) and/or electronic monitoring.  On June 15, the court suspended this condition pending appeal.

Appellant filed a timely notice of appeal on June 15, 2012.

**STATEMENT OF FACTS**

On October 18, 2011, San Francisco Police Officers Joshua Fry and John Norment were on duty, assigned to bicycle patrol in a historically high-crime area of the Bayview District.  Their job was to be a uniformed police presence in the area, as a "deterrent," working with business groups and residents to make people feel safe.  About 1:30 p.m. on October 18, the officers were at Mendell Plaza, a triangular plaza at Third Street and Palou Avenue.  This area was the "fixed post" where the officers were stationed when they were not mobile, from which they were supposed to maintain order in the area, assist people needing directions, and get to know the shopkeepers and people in the neighborhood.  The plaza was a community gathering area where it was common to find people hanging out.  Just before arriving at the plaza, the officers had been a few blocks north and they had ridden their bicycles south along Third Street to the plaza.

As the officers arrived, they saw a group of 20 to 40 people and a portable stereo on a planter box. Officer Norment testified that he made eye contact with appellant, who turned and began "shadowboxing a lamppost." The officers parked their bicycles and stood with their backs to the wall next to a MetroPCS store. They had not observed any criminal conduct or public safety concerns and had not received any noise complaints.

When the officers got off their bicycles, appellant called them "faggot[s]" and told them they belonged in the Castro. Officer Fry testified that appellant "[t]old me to go to the Castro to suck my partner's dick, to get out of the Bayveiw, that I wasn't wanted there, to go bother white people." Officer Norment testified that appellant was "very agitated," walking back and forth "like kind of a boxer would in a ring before a fight" with clenched fists and his chest "thrown out," challenging the officers to fight and saying things like "he would kick my ass." The officers "just stood there" without responding.

The volume of the music from the portable stereo was loud enough that Officer Fry was having trouble hearing the microphone in his ear, his means of communication with the police department. He unplugged the stereo, which was illegally plugged into a city electrical box. He had seen the stereo several times in the past and asked people to unplug it or turn it down but no one ever did anything about it, and no one claimed ownership of it. Fry's unplugging the stereo angered the people sitting nearby, and people started shouting things like "go bother white people." Norment testified that appellant became "very, very incensed" and started coming closer to the officers, looking like he wanted to fight them; when he came within five or six feet, Norment told him to get back, but appellant did not respond. Both officers took out their cell phones to record appellant, who was angered by this; both put the phones away without recording anything. Norment took out his pepper spray but put it away without using it because a crowd was gathering behind appellant and the spray would have hit others as well. When he took it out, appellant said something to the effect of, "I needed pepper spray, I couldn't fight him like a man."

3

Appellant continued to yell at the officers, held out his phone and moved closer to Fry, appearing to record the officer; Fry testified he was "right in front of my face" at a distance that felt like three or four inches away, although after seeing a video recording of the incident Fry realized appellant was not that close. Fry testified that he told appellant repeatedly to get away and give him space but appellant refused; Fry was afraid that appellant would hit him, and the crowd was yelling and being hostile. Norment testified that he told appellant to get back and appellant did, then came close again and when Norment told him again to get back, a woman grabbed appellant and pushed him back. Fry used his hand to move appellant's hand away from him; appellant, angry, said, "don't touch me," and continued putting his phone near the officer. Norment remembered hearing appellant say, "The next time you touch me, there's going to be problems."

Additional officers arrived, responding to a request from Norment. As appellant continued to put his phone in Fry's face, Fry told him to put his hand behind his back and, when appellant refused, placed his hand on appellant to handcuff him. Norment estimated that immediately before Fry tried to arrest appellant, appellant's phone was between "12 inches and two feet" from Fry. Appellant "violently resisted," moving his body back and forth and holding his hands in fists at his chest. Fry and Norment tried to pull appellant's arms behind his back while another officer who had arrived told the crowd to stand back. As appellant continued to resist and the officers tried to get him on the ground to handcuff him, appellant "rear[ed] up" and then leaned forward; the forward momentum caused the group to tumble forward and Norment's head hit the wall of the store. Norment testified that he felt himself lifted off the ground and flung, his head hitting the gate or the wall. He was momentarily stunned and disoriented, then he, Fry and another officer managed to get appellant handcuffed. Appellant never stopped resisting the officers' efforts to arrest him. As a result of the struggle, Fry sustained an abrasion on his right arm and his left arm, and his neck and back were sore. He did not miss work or require medical attention.

Fry testified that while appellant was holding his camera close to Fry's face and refusing to obey the officer's commands to step away, as well during the struggle to

4

arrest appellant, Fry was not able to fulfill his duty to observe the plaza and keep it safe because appellant was directly in front of him, Fry felt threatened and his attention was on appellant rather than on his patrol duties. He felt he had no option other than to arrest appellant because appellant kept "coming at [him]" despite being repeatedly told to step back. The crowd was large and angry, and Fry was afraid that he or his partner might be hurt. Fry did not use pepper spray in trying to arrest appellant because of the risk of hitting someone else in the crowd. Fry testified that his position before the incident unfolded—leaning against the wall with his hands in his jacket pockets, was intended to be "relaxed and nonconfrontational," communicating that the officers were not threatening. He acknowledged that he could have walked a short distance away and still have been able to patrol the area, but he did not do so because "it's our job to be there so that the people can wait for the bus and feel safe so that the kids can walk by." The place where the officers were standing was "our problem spot," where the homeowner association they worked with wanted them to stand.

Norment, similarly, testified that he was standing in a relaxed posture because he was trying to "deflate" the situation and not seem antagonistic or belligerent. He was nervous because he thought he and Fry were about to be attacked. Like Fry, Norment testified that while appellant was yelling at the officers and holding his phone out toward Fry's face, he was not able to patrol the plaza because all his attention was on appellant. Norment never did anything to get people to stop recording him and Fry and never told anyone to put their cameras away. Norment testified that the officers were trained to deescalate a situation through conversation, but were not allowed "to be bullied off a street corner."

Officer Thomas Ly and his partner arrived at Third Street and Palou Avenue about 1:45 p.m. and saw appellant in some sort of confrontation with Fry, yelling and repeatedly thrusting an object Ly assumed to be a cell phone in front of Fry's face as Fry repeatedly told him to stop. Ly testified that appellant was holding the cell phone as if to take a video but Ly did not think he intended to do so because of the way he kept thrusting it forward. It appeared to Ly that appellant's phone came within about six

5

inches of Fry's face. When Fry attempted to arrest appellant, Ly and his partner went to assist. As the officers struggled with appellant, Ly noticed the crowd was becoming hostile and broke away to keep people from moving closer.

Officer Rodney Fitzpatrick arrived at Third Street and Palou Avenue about 1:45 p.m. to find at least 15 police officers trying to control a "really agitated" crowd of about 50 people in the plaza. People were yelling things including that appellant had not done anything and, "police brutality, cops ain't nothing." Officers in the doorway of MetroPCS were attempting to arrest appellant, who was lying on his stomach with his arms underneath him, resisting the officers and trying to push himself up. Fitzpatrick put his knee between appellant's shoulder blades to help the officers by keeping appellant on the ground, a technique he had learned at the police academy.

After the incident, Norment was taken to the police station and paramedics placed him on a backboard with a neck brace and took him to San Francisco General Hospital, where he was examined and released. He continued to suffer soreness on the back of his head and his knee, and muscle aches in his neck and back. After the preliminary hearing on November 2, he began having episodes of confusion, difficulty concentrating and severe headaches. He was diagnosed with post concussion syndrome and treated with vicodin, and he was on disability for a week. At the time of trial, his headaches were less frequent and did not last as long.

A four-minute video taken by one of the individuals at the plaza, apparently beginning sometime after the boombox was unplugged and continuing through appellant's arrest, was played at trial.[2]

---

[2] The video initially shows the officers in front of a store doorway, Officer Norment speaking into his communication device and appellant moving toward Officer Fry while holding his phone out in front of him. Appellant steps back into the group of people, Fry steps away from him and toward Norment, and voices can be heard yelling as described in the testimony. A person in the gathered group takes hold of appellant's arm and pulls him back as he continues to yell at the officers. Fry leans against the wall of the store and Norment again speaks into his device. As the officers remain by the wall, the yelling continues, appellant and another man move around at the front of the group and appellant continues to hold his phone toward the officers from several feet away.

6

*Defense*

Appellant testified that around 1:30 on the afternoon of October 18, he was in Mendell Plaza, headed toward the planter box and power outlet by the corner near Palou, which was "a designated area for people to gather," listen to music and talk. There were a lot of people hanging out, some listening to music. Appellant saw Officers Fry and Norment riding away from the area near the planter box across Third Street, but when they reached the median, they tried to make eye contact with appellant, turned and came back. Appellant testified, "It seemed like it was in order to harass me personally." He felt he was personally targeted because the officers had just been in the area and had no problem with the radio, then came back and suddenly had a problem with it when appellant got there.

According to appellant, the music from the boombox was "low" and the people standing around it were having conversations at normal voice levels. About 10 seconds after the officers got back to the MetroPCS store, Fry "for some reason" unplugged the radio. To appellant, "[i]t seemed like it was out of spite." People, including appellant, started asking the police officers why they had unplugged the radio and calling them racist, saying they would not have done this in a white neighborhood and telling them to go to the Sunset and treat the people there this way. Appellant testified that whatever he said to the officers was "peaceful."

---

Appellant steps in closer, holding his phone up toward Fry's face and Fry takes a step forward, telling appellant several times to "get back." Fry pushes appellant's arm and appellant moves in closer, holding the phone closer to Fry's face. Fry continues to tell appellant to "get back," then pushes appellant's arm again and a woman steps in and pushes appellant away as appellant yells "don't touch me" and Fry says repeatedly, "don't put your hand in my face." As a third officer comes into the scene, appellant comes back in, holding the phone out toward Fry. Fry again says "don't put your hand in my face." Appellant continues to move the phone closer and Fry reaches out, grabs appellant's arm and starts to move it behind appellant's back. Four officers are immediately involved in a struggle that continues for some 40 seconds, when the camera angle shifts to a different man being arrested by two officers. When the camera returns to appellant, he is on the ground with two officers on top of him; other officers move in and there appears to be a struggle to secure appellant's arms.

7

After about a minute, Fry took out his iPhone and pointed it toward appellant for at least 45 seconds. Appellant believed the officer would not have held his camera up this long without recording him. Appellant felt "violated, disrespected," angry and threatened, because he was not breaking any law. He noticed Officer Norment pull out a can of pepper spray and shake it while looking directly at appellant. Appellant was worried about Norment spraying him "for no reason while I'm exercising my First Amendment right to record these officers who were harassing and recording me and disrespecting the people from the community contrary to what's in the police training guide, the community policing guide." Appellant felt the officers engaged in misconduct by unplugging the radio while people were peacefully gathered in a place designated for them to do so, treating them in a way they would not treat white people, and harassing appellant when he had done nothing wrong while murders and violent crime went unsolved. Appellant acknowledged that the officers never told him to stop recording them but he believed they conveyed this message with their actions, by slapping his hand away. Although the officers did not tell him to leave the plaza "in those exact words," they told him this by telling him to "get back" and move his hand.

Appellant took his phone out shortly after Fry began recording him, intending to "record the misconduct" and put the recording on YouTube and the public access channel. He walked up to the officers "slowly" to get good shots of their faces and badges. The closest his phone got to Fry's face was at least two feet away because any closer the officer would have been able to knock his hand away and he would not have been able to get the officer's whole face in the shot. Appellant testified that if his phone had a zoom feature, he did not know how to use it. Fry told him to " 'get back' " and to get his hand and phone out of Fry's face. Appellant backed up and Fry stepped toward him, slapping his hand with "some force." Appellant acknowledged that at this point the video from his camera documents him saying "you touched me, you touched me" and then "I'll beat your ass out here, boy." He testified that he said this to communicate that if Officer Fry "continued to assault" him, appellant "was going to be forced to defend himself." Appellant's subsequent statements, including calling the officers "fucking

8

punks" and "faggot ass motherfucker," were "insults" because he was angry.[3]  Appellant had no intent to start a fight with the police, only to exercise his First Amendment rights. He testified that the First Amendment protected his right to record the officers regardless of whether they were doing anything wrong, as well as his right to call them names.

After hearing a siren, which indicated to appellant that more officers had arrived, appellant approached the officers again, starting a new recording and getting Fry's badge number and face again.  Fry said, "you know what," in a "matter of fact kind of way like he had some kind of attitude or some kind of grudge against me like he was taking his job personal," and then grabbed appellant and told him to put his arms behind his back. Officers Ly, Norment, and Spain all surrounded appellant, who believed they were trying to take his phone to keep him from recording them.  Appellant turned his body because Fry was trying to knee him in the "privates."  According to appellant, Fry continued to knee and assault him, while Norment tried to put his arm around appellant's neck and held onto a handful of appellant's hair.  Appellant felt himself being pulled by his hair and his neck and lifted in the air from behind, and they all fell to the ground.  He testified that he passed out for a second or two and woke up with Officers Norment and Spain on him and pain in his neck, hand and head.  His fourth and fifth fingers had a "tingling numb feeling" and he could not straighten them. Appellant said that he intentionally tried to stay on his feet during the arrest because he did not want to be "slammed" on his face or to get his "head bust."  He believed that the officers had already used force on him and "shown their bias," so there was "no telling what they might have done if they would have gotten me on the floor.  They might have killed me."

A short video taken from appellant's phone shows the camera focusing in on Officer Fry's face and badge; the officer says "get back" repeatedly and a voice can be

---

[3] Appellant denied that "faggot" was an insult meaning homosexual, saying its dictionary definition was "a cigarette or fuel for fire," and stated that "ass" means "donkey."  Other words he acknowledged using toward the officers, "ho" and "punk" were just used as insults with no particular definition.

9

heard saying "you touched me, you don't touch me" and "I can stand where I want to stand."

Gerald Robinson testified that as he arrived at the plaza to charge his phone from the electrical outlet, he saw two police officers walking across Third Street, one with his bicycle and the other without. Appellant was at the plaza, talking with his brother; Robinson did not see appellant shadow boxing. The officers walked by, then turned back, unplugged the boombox and stepped back closer to the wall. Some of the people in the area got upset and disputed the officers' right to unplug the radio. The officers said the outlets were for city use only, but indicated the people could use them once the officers left. People continued to ask why the officers were there when no one was doing anything and the officers did not answer. One of the officers took out a phone and held the camera aimed at appellant, appearing to record him. A handful of people, including Robinson, pulled out their phones and started recording the police. It was Robinson's recording that was played at trial. Before he started recording, Robinson did not hear anyone yelling and did not hear appellant tell the officers to go to the Castro.

Appellant had his camera out and it looked to Robinson as though he was trying to move his camera in to get a clear picture of the officers' faces and badge numbers. According to Robinson, appellant "moved real slow" and did not look like he was going to hit the officers. Robinson demonstrated the closest he saw appellant's phone get to Officer Fry's face, a distance the prosecutor and defense counsel agreed to be about 12 to 14 inches. The crowd was shouting and Robinson heard someone say "back up" and heard appellant's brother talking about calling a legal group. Robinson testified that the police officer pushed appellant's hand and camera toward his face, causing appellant to hit himself, and that this was shown on the video; what the video in fact shows is that Fry's push caused appellant's hand to move in a circular direction away from the officer and over appellant's head, making no contact with any part of appellant's body. When the officers started to place appellant under arrest, the crowd moved in closer to see and some people said things like "let him go" and "he didn't do nothing." Robinson testified that when appellant and the officers arresting him fell, no officer's head hit the wall.

10

Robinson acknowledged that he had been convicted of two felony drug sales in 2002 and burglary in 2005, and was on probation for a 2010 felony drug sale. He had known Pladee Clayton, who was also arrested in this incident, for over 20 years and had known appellant "a couple" of years.

Melissa Gore, a nurse practitioner who saw appellant at the county jail on October 26, testified that appellant complained of ongoing neck and back pain and inability to flex his left fourth and fifth fingers. She noted that he had decreased sensation in these fingers and was unable to fully extend them. Appellant told her he thought his symptoms were due to being assaulted by the police when he was arrested. Gore did not think it likely that the finger symptoms resulted from this recent an injury.

The physician who saw Officer Norment in the emergency room on October 18 testified that Norment had a "fairly minor head injury" and did not show signs of a concussion. Dr. Sporer testified that complications from a concussion most often occur in the first few days after the injury and it would be unusual to have symptoms first arise after a week, but symptoms could occur later. Neuropsychologist Howard Friedman testified that nothing in Norment's medical records indicated he suffered a brain injury and that the headaches Norment began to experience around November 2 would not have been related to any injury on October 18.

## DISCUSSION

### I.

Appellant argues that the evidence was insufficient to support his convictions for obstructing a peace officer performing his lawful duties in that there was no evidence the officers were performing any lawful duties with which appellant interfered and no evidence the officers' orders for appellant to move away were lawful.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson*

11

(1980) 26 Cal.3d 557, 578.) The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

"The legal elements of a violation of section 148, subdivision (a) are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1108-1109.) "The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329.) "Defendant cannot be convicted of an offense against an officer engaged in the performance of official duties unless the officer was acting lawfully at the time." (*Simons,* at p. 1109.)

Appellant urges that the only suggestion of duties the officers may have been performing was Fry's testimony that he could not hear the transmissions on his radio and the prosecutor's argument—which appellant views as unsupported by any evidence—that the officers were unable to observe and patrol the plaza. In appellant's view, the officers were simply "riled" by his conduct, insults, and recording of the officers' "dismissive" conduct. Acknowledging that his statements "in other circumstances" could be construed as threats of harm, appellant asserts that the video demonstrates the officers were not afraid of him, and that the jury's failure to convict him of the section 69 charge demonstrates the jury did not find his threats to be more than expressions of " 'jest or frustration.' " Appellant maintains that he was arrested for engaging in the protected behavior of recording the officers in a public place (*ACLU of Illinois v. Alvarez* (7th Cir. 2012) 679 F.3d 583 [reversing denial of preliminary injunction against enforcement of statute prohibiting audiovisual recording of police officers engaged in official duties in public place].)

12

The weakness of appellant's argument is revealed in his observation that the "one possible theory" upon which appellant could have been criminally liable "must revolve around the distance at which he videoed the officers and his refusal to heed their commands that he stand back." Just so. Appellant initially videoed Officer Fry from a distance of several feet. Problems began when he moved his phone closer to the Officer's face, repeatedly ignoring the officer's directives to move himself and the phone further away. Contrary to appellant's claim of lack of evidence, both Fry and Norment testified that their assignment on the day in question was to patrol the plaza and "be a presence" to deter criminal activity in this high-crime area. Both officers testified that they were unable to perform this duty because appellant's conduct required them to devote their entire attention to him, thereby precluding them from attending to anything else occurring in the area. This testimony amply supports the convictions, as does the video documenting the episode. The video documents appellant at the front of a crowd of people yelling insults at the officers, who did not react until appellant repeatedly moved closer to Fry, holding his phone toward Fry's face, ignoring the officers' commands to move back, and returning after Fry physically moved appellant's hand away with his own hand. The video confirms the situation the officers described, in which appellant was so aggressively persistent in his conduct that the officers had no choice but to devote their full attention to appellant, leaving them unable to perform their assigned duties at the plaza.

Appellant's attempt to portray his conduct as a simple exercise of protected First Amendment rights is not persuasive. " '[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.' (*Houston v. Hill* (1987) 482 U.S. 451, 461 [(*Houston*)].) In fact, '[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.' (*Id*. at pp. 462-463; see also *People v. Quiroga* [(1993)] 16 Cal.App.4th [961,] 966.) Even though the police may dislike being the object of abusive language, they are not allowed to use the awesome power which they possess to punish individuals for conduct that is not only

13

lawful, but which is protected by the First Amendment. (*Duran v. City of Douglas, Ariz.* (9th Cir. 1990) 904 F.2d 1372, 1378.) For this reason, section 148 must be applied with great care to speech. (. . . *Quiroga*, . . . at p. 968.) Although fighting words or disorderly conduct may lie outside the protection of the First Amendment, the areas of unprotected speech are very narrow. (*Ibid.*)" (*In re Muhammed C., supra,* 195 Cal.App.4th at pp. 1330-1331.)

But even verbal expression must be evaluated in light of the circumstances. The United States Supreme Court has observed that while a municipality cannot constitutionally authorize police to arrest a person who "in *any* manner verbally interrupts an officer," it would be constitutional to " 'punish an individual who chooses to stand near a police officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection.' " (*Houston, supra,* 482 U.S. at p. 462, fn. 11.) The First Amendment does not preclude conviction under section 148, subdivision (a), where words go "beyond verbal criticism, into the realm of interference with duty." (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 261, disapproved on other grounds in *People v. Smith* (2013) 57 Cal.4th 232, 242.) Here, appellant's verbal communication was coupled with conduct that clearly interfered with the police officers' ability to do their jobs.

## II.

Appellant further argues that the court did not instruct the jury adequately regarding the violation of section 148, subdivision (a), that was alleged as a lesser offense of the section 69 violation charged in count 2. He raises a number of specific complaints, which we will address in turn after setting out the basic principles applicable to appellant's claim.

" '[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 667, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.) "That obligation includes instructions on all of the elements of a charged offense." (*People v.*

14

*Cummings* (1993) 4 Cal.4th 1233, 1311.) "As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574, quoting *People v. Kimble* (1988) 44 Cal. 3d 480, 503.) " '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' " (*Estrada*, at p. 574, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 327.)

Here, the court instructed pursuant to CALCRIM No. 2656 that in order to prove appellant guilty of violating section 148, subdivision (a), the prosecution was required to prove that "the officer involved was a peace officer lawfully performing or attempting to perform his duties as a peace officer," that appellant "willfully resisted, obstructed or delayed that officer in the performance or attempted performance of those duties," and that when appellant acted, "he knew or reasonably should have known that the officer was a peace officer performing or attempting to perform his duties." The instructions continued, "Someone commits an act willfully when he does it willingly or on purpose. [¶] It is not required that he intend to break the law, hurt someone else or gain any advantage." The court also instructed that "[a] peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties." (CALCRIM No. 2670.)

*Unanimity*

Appellant first contends that the trial court erred in failing to instruct that the jurors were required to agree unanimously on which lawful activities the officers were performing at the time of appellant's arrest and on when appellant's actions became a crime. The court did *not* read the paragraph in CALCRIM No. 2656 pertaining to unanimity, which would have specified the acts by which the prosecution alleged appellant resisted, obstructed or delayed the officer and directed, "You may not find the defendant guilty unless you all agree that the People have proved that the defendant

15

committed at least one of the alleged acts of [resisting, obstructing or delaying the officer] who was lawfully performing his or her duties, and you all agree on which act [he] committed." (CALCRIM No. 2656.) The court did instruct, with respect to the charged section 69 offense, that the jurors had to agree unanimously on which of appellant's acts was the basis of the offense.

In order to ensure the defendant's constitutional right to a unanimous verdict, "[i]t is established that some assurance of unanimity is required where the evidence shows that the defendant has committed two or more similar acts, each of which is a separately chargeable offense, but the information charges fewer offenses than the evidence shows." (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 611-612.) "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' (*People v. Diedrich* [(1982)] 31 Cal.3d [263,] 281); it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' (*People v. Perez* (1993) 21 Cal.App.4th 214, 223.) In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135 (*Russo*).) A unanimity instruction is not required where the offense was committed as part of a "continuous course of conduct, whose acts were so closely connected in time as to form part of one transaction." (*People v. Maury* (2003) 30 Cal.4th 342, 423.)

Appellant maintains that a unanimity instruction was required because the jurors could have disagreed about what lawful duty the officers were performing or about which of appellant's acts amounted to resisting, obstructing or delaying the officers'

16

performance of their duties. The former point derives from appellant's view that the officers were performing no duties at all while appellant was approaching Fry: He describes the video as portraying Officer Fry "standing while in the company of Officer Norment and not doing much else," and the officers' remaining "relatively immobile" as appellant moved around with his cell phone, until Frye made physical contact with appellant. As we have said, the evidence supports a determination that the officers, as they explained, were attempting to perform their assigned duty of maintaining a presence in the area to deter criminal activity. Indeed, there was no evidence of any other duty the officers might have been performing or attempting to perform. On this issue, there was simply no basis upon which the jurors could have disagreed.

As for potential disagreement about appellant's actions, appellant's focus is on the fact that his conduct began as an exercise of his First Amendment right to criticize the police. In his view, some jurors might have believed that he resisted, obstructed or delayed the officers' performance or attempted performance of their duties by his verbal abuse and filming of the officers while others believed it was only when he moved too close to the officers that his previously protected behavior became a criminal offense.

The jury was instructed that neither appellant's insults nor his filming of the officers, on their own, were unlawful. The prosecutor specifically emphasized in closing argument that appellant was not being prosecuted for what he *said* but for what he *did*: "The officers told you themselves, 'we did not mind the words. We didn't mind the insults. We're used to that. We're trained to put up with that. [¶] The problem was we couldn't do our job because he was in our face and would not get back, and he was distracting us by yelling at us and being in our face.' " Appellant engaged in a continuous course of conduct that eventually crossed the line from lawful to unlawful. Contrary to appellant's characterization, there is little question when that point occurred. Appellant's yelling and holding out his cell phone did not provoke a response from the officers initially; it was only when appellant repeatedly moved closer to the officers despite their commands to step back that Officer Frye moved to arrest him. It is apparent that the resisting, obstructing or delaying an officer at issue in count 2 falls within the

17

category that *Russo* instructs does *not* require a unanimity instruction. If jurors disagreed about the precise moment when appellant's conduct crossed the line, the disagreement would have been about "the exact way [appellant] is guilty of a single discrete crime," not about which of multiple discrete crimes appellant committed. (*Russo, supra,* 25 Cal.4th at pp. 1134-1135.)

*Lawfulness of Officers' Orders*

Appellant next contends that the trial court erred in failing to instruct the jury that appellant was only required to obey the officers' *lawful* orders. He maintains that the jury demonstrated its doubt whether Officer Fry was performing a lawful duty at the time he ordered appellant to "step back" by sending the court the question, "Was the defendant required to move away when Fry [*sic*] said 'step back?' " Appellant argues that the court had a sua sponte duty to anticipate this question and address it in its instructions. As we understand it, appellant's argument is that without an instruction that appellant was only required to comply with the officer's lawful orders, the jury had insufficient guidance on how to decide whether the officers were engaged in the performance of lawful duties at the time of appellant's alleged offense.

We do not view the jury's question as reflecting any uncertainty as to whether Officer Fry was performing a lawful duty at the time he ordered appellant to step back. The jury's full question was, "Is there a legal requirement for the general public to comply with police officer orders? For example: was the defendant required to move away when Fry said 'step back'?" The question did not pertain to what duties the officer was engaged in at the moment he said, "step back"; it was a general question about citizens' legal obligations to comply with police officers' orders.

In any event, the trial court's instructions addressed each of the elements of the offense of which appellant was convicted. If appellant believed further instruction was required on a particular point raised by the evidence, it was incumbent upon him to request a clarifying instruction. (*People v. Estrada, supra,* 11 Cal.4th at p. 574.) He did not do so.

18

Appellant cites *In re Manuel G.* (1997) 16 Cal.4th 805, 817, for the proposition that the trial court had a sua sponte duty to instruct that in order to convict, the jury had to find not only that the officers were acting lawfully at the time of the offense but also that their commands were lawful. *Manuel G.* was concerned with a charge of violating section 69 by attempting threats or violence to deter or prevent an officer from performing a duty imposed by law. (*Manuel G.*, at p. 814.) At the page cited by appellant, the court explained that for this offense, while the threat of violence must be intended to deter an officer's lawful conduct in connection with his or her duties as an officer, the statute "does not require that the officer be engaged in the performance of his or her duties at the time the threat is made. Instead, the plain language of the statute encompasses attempts to deter *either* an officer's *immediate* performance of a duty imposed by law *or* the officer's performance of such a duty at some time *in the future*." (*Id.* at p. 817.) This is in contrast with the other type of offense under section 69, resisting an officer by force or violence, for which the officer must have been acting lawfully when the defendant resisted. (*Manuel G.*, at p. 816.) We fail to see how *Manuel G.* furthers appellant's argument beyond the undisputed point—covered in the court's instructions—that the conduct appellant resisted or attempted to deter had to be lawful.

Appellant additionally suggests that a proper instruction would have "paralleled the definition of the offense of failure to disperse following an order by an officer," citing CALCRIM No. 2686 and *In re Brown* (1973) 9 Cal.3d 612, 623, for the statement that this offense "requires as well that the officer's order was lawful and made only under conditions of a clear and present danger of violence." Appellant was not charged with failure to disperse, the subject of CALCRIM No. 2686, or unlawful assembly, the offense at issue in *In re Brown*. To the extent appellant is suggesting his conviction under section 148, subdivision (a)(1), required proof of a clear and present danger of violence, as discussed in *In re Brown* for unlawful assembly, he offers no support for the suggestion. The express "lawful order" requirement stated in CALCRIM No. 2686, which instructs that the offense of refusing to disperse after being ordered to do so requires proof that the defendant was present at the location of a riot, rout, or unlawful assembly, a public

19

officer lawfully ordered the defendant to disperse, and the defendant willfully remained present after the order, states a necessary element of the offense. Resisting or attempting to deter an officer's performance of duty does not necessarily involve compliance with an officer's order. As we have said, the jury was repeatedly instructed that appellant could be convicted only if the officers' conduct he resisted or sought to deter was lawful. This was sufficient for the jury's understanding of the case. Again, if appellant felt the jury needed to be specifically instructed that giving an unlawful order did not constitute lawful conduct, it was his obligation to request such an instruction.

Finally, contrary to appellant's further argument, the trial court's response to the jury's question correctly clarified how the jury should determine whether appellant was required to comply with the officers' orders. The court responded to the jury's question as follows:

"The answer to this question is a question for the jurors to answer, and I think that now that you have the benefit of all of the court's instructions, you can read the instructions that deal with performance of duty and use of excessive force, if there was such, and self-defense.

"So, in answer to your question 'was the defendant required to move away when Officer Fry said, "step back," ' the answer is as follows:

"If the jury believes that the order was not in the lawful performance of his duties, then the answer would be no, there was not a requirement to move back.

"On the other hand, if the jury believes that the order was given in the lawful performance of his duties and the defendant's conduct, as determined by the jury, obstructed the officer or violently threatened the officer by words and conduct to deter or prevent the performance of the official duty, then the answer can be yes, that there was a requirement to move away.

"Consult—you should read all the instructions.

"In particular, you can read instruction 2651, which further provides that a police officer may use his own discretion in performing his job duties, and also, under the self-

20

defense instruction, may give such order if the jury believes it was a reasonable exercise of self-defense as set forth in the self-defense instructions which commence with 3470.

"If that is the situation, then the answer is different—could be different as determined by the jury."

Appellant complains that the court's response did not direct the jury to determine whether the officers were performing "an identifiable duty with which appellant interfered at the time he was ordered to move away." But the jury was repeatedly informed, in the court's response to this question and previously in the instructions defining the charged and lesser offenses, that appellant could not be convicted unless the jury found that the officers were engaged in the performance of their lawful duties. As we have discussed, the evidence raised no question as to what duty the officers claimed they were attempting to perform; the jurors had to accept or reject the officers' testimony that they were performing their assigned task of patrolling and maintaining a presence at the plaza, but there was no suggestion any other duty was at issue.

Appellant also complains that the court's reference to self defense was improper and likely to mislead the jury because there was no evidence Officer Fry acted in self defense prior to the initiation of the arrest process. This is not correct. Officer Fry testified that he felt threatened by appellant, he was afraid appellant would hit him, and he was afraid he or Norment might be hurt. Officer Norment perceived appellant's conduct similarly: He testified that appellant, "very, very incensed," began to come closer to the officers, looking like he wanted to fight them; when Norment took out his pepper spray, appellant said something about the officer needing pepper spray and being unable to "fight him like a man." Norment was nervous because he thought he and Fry were about to be attacked. It was for the jury to evaluate Officer Fry's directive to appellant to move away in the context of the circumstances the witnesses described and the video portrayed.

### Appellant's Knowledge

Appellant further contends that the trial court erred in failing to instruct that appellant could not be convicted unless he had knowledge that he was violating a lawful

21

order. The starting point of appellant's argument—that section 69 requires " 'actual knowledge on the part of the defendant that the person being resisted is an executive officer and that the officer is engaged in the performance of his/her duty' at the time he commits the offense," as stated in *People v. Hendrix* (2013) 214 Cal.App.4th 216 and *People v. Rasmussen* (2010) 189 Cal.App.4th 1411, 1419, 1421—is unassailable, but not relevant to the knowledge element of the offense appellant was convicted of, violation of section 148. While section 69 requires that the defendant "knowingly" resisted the officer engaged in lawful duties, section 148 requires only that the defendant "knew *or reasonably should have known*" that the person resisted, obstructed, or delayed "was a peace officer engaged in the performance of his or her duties." (*People v. Simons, supra,* 42 Cal.App.4th at pp. 1108-1109, italics added.) *People v. White* (1980) 101 Cal.App.3d 161, 166, which appellant cites for the proposition that violation of section 148 requires the same actual knowledge as violation of section 69, in fact discusses the requirement that the officer's conduct must be lawful but says nothing about the defendant's knowledge of that fact, much less the defendant's knowledge that his own conduct is unlawful. Nor is the defendant's knowledge of the unlawfulness of his or her conduct discussed in *People v. Gonzales* (1990) 51 Cal.3d 1179, 1217, upon which appellant relies for its statement that disputed facts on the lawfulness of the officer's duty must be submitted to the jury—which they were in the present case.

Appellant's attempt to liken his case to one involving a charge of participating in an unlawful assembly (§§ 407 [defining "unlawful assembly" as two or more persons assembled together "to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner"], 408 [misdemeanor to participate in a "rout or unlawful assembly"]) is not persuasive. Appellant points out that a person cannot be convicted of violating sections 407 or 408 absent evidence that the defendant "knowingly" participated in an assembly where unlawful acts were being committed. (*In re Wagner* (1981) 119 Cal.App.3d 90, 103-104.) The knowledge requirement in the present case is different. The offense of unlawful assembly does not require that the defendant personally committed any unlawful act; he or she must know, however, that *someone* in the

22

assembly did so; continued participation in spite of this knowledge is what defines the offense. A conviction under section 148, by contrast, is based on the defendant's own commission of an unlawful act. It requires only "willful" conduct—meaning that the person "not only has 'a purpose or willingness to commit the act' but also 'knows what he is doing[,] intends to do what he is doing[,] and is a free agent.' " (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1197, quoting *In re Trombley* (1948) 31 Cal.2d 801, 807; *People v. Atkins* (2001) 25 Cal.4th 76, 85.) It "does not require any intent to violate law, or to injure another, or to acquire any advantage." (§ 7.) Even a statute requiring the defendant to act "knowingly" does not require knowledge that the act is unlawful: "The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission." (*Ibid.*)

While appellant believed himself to be engaged in exercising his First Amendment rights, the requirements of section 148 are clear. The prosecution had to prove that the officers' were engaged in the performance of their lawful duties; that appellant knew or reasonably should have known the officers were peace officers performing or attempting to perform their duties; and appellant willfully resisted, delayed or obstructed the officers' performance of those duties. There is no requirement that appellant knew precisely when his actions became "violative of the law," as he contends

### Pre-arrest Warning

Appellant next challenges the trial court's failure to instruct that when it is not apparent that an officer is performing his lawful duties, the defendant must be warned he is obstructing the officer before he can be arrested. He contends that because his initial conduct was constitutionally protected, the officers had to advise him that he was subject to arrest at the point his actions became unlawful. He further contends that the trial court's instructions on the lawfulness of peace officers' conduct omitted the portion of CALCRIM No. 2670 stating, "[The officer must tell that person that the officer intends to arrest him or her, why the arrest is being made and the authority for the arrest.] [The officer does not have to tell the arrested person these things if the officer has probable

cause to believe that the person is committing or attempting to commit a crime, is fleeing immediately after having committed a crime, or has escaped from custody.] [The officer must also tell the arrested person the offense for which he or she is being arrested if he or she asks for that information.]" (CALCRIM No. 2670.)

Neither appellant nor respondent have read the record correctly. In reading CALCRIM No. 2670 to the jury, as well as in the written instructions, the court included the portion of the instruction stating, "The officer must tell a person being arrested that the officer intends to arrest him, why the arrest is being made and the authority for the arrest. [¶] The officer does not have to tell the arrested person these things if the officer has probable cause to believe that the person is presently committing or attempting to commit a crime." The court omitted only the portions of the instruction that had no application to the facts of the case—that the officer need not provide the information specified if the person being arrested "is fleeing immediately after having committed a crime, or has escaped from custody" and that the officer must tell the person the offense for which he or she is being arrested if the person asks.

Appellant urges that the provision stating an officer does *not* have to warn a person of his intent to arrest or provide the reason and authority for the arrest if the officer has probable cause to believe the person is presenting committing or attempting to commit a crime is not applicable in the present case because "the very issue is whether the actions in which appellant was engaged constituted a crime at all, and whether he had knowledge of that fact." The issue was properly given to the jury. If the jury had accepted appellant's argument that he was exercising his First Amendment rights and not interfering with any lawful execution of duties by the police officers, the jury would have found appellant not guilty. The verdicts, finding appellant not guilty of the felony offenses but guilty of the lesser included ones, reflects the jury's determination that the prosecution failed to carry its burden of proof as to appellant's intent—required for conviction under section 69—and Officer Norment's injury, but did prove beyond a reasonable doubt that appellant resisted, obstructed, or delayed the officers' lawful performance of their duties.

24

*Words as Basis for Arrest*

As requested by the defense, the court instructed in describing the offense charged in count 2, violation of section 69, that "[t]hreats are statements that a reasonable listener would understand in light of the context and surrounding circumstances, to constitute a serious expression of an intent to commit an act of unlawful violence, rather than an expression of jest or frustration."[4] The trial court did not, however, give an instruction requested by the defense that would have stated, " 'The First Amendment protects the right of a citizen to verbally criticize or challenge police officers. Speech that is provocative and challenging is protected against censorship and punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' " Appellant contends that because the latter instruction was not given, the jury might have concluded that although his words of "jest or frustration" did not violate section 69, they could be the basis of arrest for violation of section 148.

Finding that appellant's authorities provided no support for the proposed instructions as written, the trial court stated, "[t]he defendant cannot be convicted for his statements to the police based on the facts of this case. [¶] The police say that no crime was committed by the defendant's statement to them or by the CALCRIM instructions that the court is giving on the definition of the offenses involved.

---

[4] Based on appellant's citation to the record, it appears he is challenging the court's decision not to give "Special Instruction 1," quoted in the text as it appears on the cited page of the clerk's transcript. At another point in the record, "Special Instruction 1" continued with an additional paragraph stating, " 'True threats' are not protected by the First Amendment. True threats are statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a serious expression of an intent to commit an act of unlawful violence, rather than an expression of jest or frustration." Appellant also requested "Special Instruction 2": "The First Amendment right to free speech protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest. The act of video recording the police in a public place is constitutionally protected activity."

25

In addition to the instruction about threats quoted above, the court instructed the jury that "[i]nsults by themselves to peace officers performing their duties are not unlawful. [¶] If such insults are reasonably and objectively believed to presently accompany an immediate or imminent assault, the officers may use lawful self-defense as set forth in the court's other instructions on this subject. [¶] Audio and video recording of police officers performing their duties in public is lawful. [¶] . . . [¶] However, conduct that obstructs, resists or delays an officer's performance of his duties may be found unlawful as provided for in these instructions."

Appellant argues that under the First Amendment, "for speech to be proscribed in any manner, or form the basis of a criminal action, it must pose some danger to persons affected by it." His authorities all concern attempted restrictions on pure speech. The proposed instruction at issue was drawn from *Houston*: " 'Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' " (*Houston, supra,* 482 U.S. at p. 461, quoting *Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4." As we discussed earlier, *Houston* struck down a municipal ordinance that made it unlawful to verbally "interrupt a police officer in the performance of his or her duties" as constitutionally overbroad, but acknowledged that in certain circumstances, a combination of speech and conduct that interfered with an officer's performance of his or her duties might constitutionally be punished. (*Houston*, at pp. 460, 462, fn. 11.) Here, as appellant was punished for his *conduct*, these cases concerning criminalization of pure speech do not support his argument that his expression of outrage could be criminalized only if it presented a "clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."[5]

---

[5] *People v. Mirmirani* (1981) 30 Cal.3d 375, 382, found unconstitutionally vague two statutes that criminalized certain threats made to "achieve social or political goals." Among other things, the court noted that the crime defined by these statutes "can be committed by words alone, without action or an intent to act. Therefore, the strict

The trial court's instructions informed the jury that it was lawful for appellant to insult the police officers and to make audio and video recordings of the officers' public conduct, and specifically distinguished this lawful conduct from unlawful obstruction, resistance or delaying of the officers' performance of duties.[6] These instructions precluded the jury from convicting appellant solely on the basis of his constitutionally protected activity. The officers testified that they did not arrest appellant because of his insults or his recording of them but because his conduct, repeatedly moving close to them and holding his phone toward Fry's face despite orders to move back, combined with his expression of anger, demanded all their attention and made it impossible for them to

standards required by the First Amendment must be applied in analyzing respondent's vagueness challenge. '[A] statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind.' " (*Id.* at p. 383, quoting *Watts v. United States* (1969) 394 U.S. 705, 707.) The *Mirmirani* court noted, "Although the Legislature may constitutionally penalize threats, even though they are pure speech, statutes which attempt to do so must be narrowly directed only to threats which truly pose a danger to society." (*Mirmirani*, at p. 388, fn. 10.)

*Bridges v. California* (1941) 314 U.S. 252, 258, involved contempt of court convictions based upon comments pertaining to pending litigation that were published in newspapers. The court noted the statement in *Schenck* v. *United States* (1919) 249 U.S. 47, that in determining whether a law abridges the constitutional right to free expression, "there must be a determination of whether or not 'the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils.' " (*Bridges,* at p. 261, quoting *Schenck.*) Although commenting that this statement did not "comprehend the whole problem," the court viewed it as affording "practical guidance in a great variety of cases in which the scope of constitutional protections of freedom of expression was in issue." (*Bridges,* at pp. 261-262.)

[6] Appellant argues that the jury was only told appellant's words and recording activity could not be the basis of a violation of section 69, not that they could not be the basis for his arrest. He is mistaken. As given orally by the court, the instructions that insults and recording of police officers are not in themselves unlawful were not connected to the instructions on the elements of a violation of section 69; they followed the court's instructions on the elements of all the charged and lesser offenses, on self defense, on lawful performance of peace officers' duties and on reasonable use of force. In the written instructions, these instructions appear on a page captioned "Instruction Regarding the First Amendment."

perform their assigned duties. The prosecutor stated in closing argument that appellant had a legal right to insult the officers and record them. Appellant's assertion that there is a reasonable chance the jury believed that his words could be a legitimate ground for arresting him for violation of section 148 is without basis.

Appellant asserts that the trial court had a duty to go beyond the standard CALCRIM instructions in this case because the evidence suggested he honestly believed he was acting in accordance with his constitutional right to free speech. Acknowledging that "current law" does not require more than general intent for a violation of section 148, he urges that where a defendant believes he is exercising protected First Amendment rights, he may be convicted of violating section 148 only upon proof of scienter, knowledge that his acts were not constitutionally protected.

Appellant relies upon *Village of Hoffman Estates v. Flipside, Hoffman Estates* (1982) 455 U.S. 489, 499 (*Hoffman*), and *City of Chicago v. Morales* (1999) 527 U.S. 41, 55 (*Morales*). These cases discuss facial challenges to statutes as unconstitutionally vague. A law may be invalidated for vagueness if it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or if it authorizes or encourages arbitrary and discriminatory enforcement. (*Morales,* at p. 56; *Hoffman,* at p. 498.) *Hoffman* explained that the degree of vagueness constitutionally tolerated in a law depends in part on the nature of the law, with greater tolerance extended to laws with civil rather than criminal penalties and "a more stringent vagueness test" applied to a law that "threatens to inhibit the exercise of constitutionally protected rights" such as the right to free speech or association. (*Hoffman,* at pp. 498-499.) *Hoffman* noted that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." (*Id.* at p. 499.) *Morales,* similarly, stated that "[w]hen vagueness permeates the text" of a "criminal law that contains no mens rea requirement," the law is subject to facial attack. (*Morales,* at p. 55.)

Appellant is not challenging the constitutionality of section 148. Indeed, his statement that he would not contest the application of section 148 "to situations where the

officers are acting in the performance of an actual and identifiable duty" reveals that the predicate for his "scienter" argument is simply his view of the evidence, under which the officers were engaged in no duty at all and had no authority to order him to move away. The constitutional principles stated in *Hoffman* and *Morales* provide no support for appellant's argument that he could not be convicted of resisting, delaying, or obstructing a peace officer absent knowledge that he was mistaken in believing he was engaged in constitutionally protected activity.

Moreover, as we have said, the trial court *did* supplement the standard CALCRIM instructions with instructions addressing the First Amendment issue. Had the jurors believed appellant was *only* insulting the officers and recording them, the instructions would have directed them to find appellant not guilty.

Finally, having rejected appellant's individual claims of instructional error, we necessarily find meritless the additional contention that the cumulative effect of the errors is prejudicial.[7]

---

[7] In the course of this argument, appellant suggests that the jury's questions to the court during deliberations demonstrate confusion over how to determine whether the officers were acting lawfully and what obligations appellant had to comply with their orders. In fact, none of the questions reflect confusion over how to view the officers actions; the only one that might have reflected the jury's consideration of the section 148 offenses was the one we have discussed concerning appellant's obligation to comply with Fry's order.

The other questions were as follows. Shortly after beginning deliberations, before receiving the written jury instructions, the jury asked the court for the legal definitions of "serious bodily injury" and "simple assault," as well as the question about appellant's obligation to comply with Fry's order to step back. Later, the jury asked, " 'When did the moment of assault occur?' " Still later, after informing the court that it was deadlocked on count 2, the jury asked several questions pertaining to the intent required under section 69 and definition of "threat" in that offense:

1) "Please clarify in the instructions 2651, count II point #2 the sentence – 'When the defendant acted, he intended to prevent or deter the executive officer from performing the officer's lawful duty.' (1) Please further define 'intended.' Please confirm or deny that the jury cannot know what the defendant's intention was at the time he acted, since we cannot know what he was actually thinking at that time. How else may we as the jury infer intent?"

29

**DISPOSITION**

The judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Stewart, J.

---

2) "(1)  Who is the 'reasonable listener'?
      -a reasonable bystander?
      -the police officer?
      -the person making the threats?
   "(2)  Please further clarify 'a serious expression of an intent to commit an act of unlawful violence, rather than an expression of jest or frustration.'"

3) "Please clarify the term 'threat of violence' in the instructions as it pertains to the following sentence.
   " 'Threats are statements that a reasonable listener would understand, in light of the context and surrounding circumstances, to constitute a serious expression of an intent to commit an act of unlawful violence, rather than an expression of jest or frustration.' "

4) "In the instructions 252 Union of Act and Intent, specific to the phrase '. . . but must do so with a specific intent.'  [¶]  Does specific intent refer to 'prevent or deter the executive officer from performing the officer's lawful duty'?  [¶]  Is it possible for the defendant to have more than one intent?"

30